W. A. SIMMS ET AL. V. CHARLES E. SUMMERS.

FILED MARCH 21, 1894.   No. 4827.

1. **Contracts:** CONSTRUCTION.   When a contract is to be construed by its terms alone, without the aid of extrinsic facts, it is the duty of the court to interpret it.

2. **Guaranty:** ACCOMMODATION NOTES: LIABILITY OF MAKERS. Where parties agreed to vouch for another in the purchase of goods to the amount of $100 each, and soon thereafter each executed to him an accommodation note to the amount named, which notes were taken by him and used in such purchase of goods, the parties thus having loaned their credit were subsequently in no way further liable than as evidenced by said notes and might purchase his stock of goods from the party whom they had thus accommodated, with the same rights and immunities as might any third parties and subject only to like disabilities.

3. **Contracts:** THIRD PARTIES.   A party seeking to avail himself of the terms of a contract between other parties must do so subject to all its conditions and restrictions.

ERROR from the district court of Fillmore county. Tried below before MORRIS, J.

*Ong & Jensen* and *W. C. Sloan*, for plaintiffs in error.

*Edgar C. Ellis, Carson & Fifield*, and *F. B. Donisthorpe*, contra.

RYAN, C.

John H. Wright, in the fore part of the year 1890, was the owner of no property but his homestead; nevertheless he greatly desired to embark in the retail merchandising business in Strang, the village wherein he resided.    There was one serious obstacle to this very laudable ambition—a total want of capital.    At different times he presented these matters to F. H. Higgins, a traveling salesman, who, in the interest of the Grimes Dry Goods Company, of Kansas City, Missouri, occasionally visited the village of Strang, situated in Fillmore county, Nebraska, and from him received suggestions and advice as to his plans.    It seems that he also consulted other philosophers of the peripatetic school with the same purpose, in each instance receiving the most disinterested encouragement.    At length, in May of the year 1890, Mr. Wright was able to extend upon paper the terms of a contract to which if he could obtain the signature of a sufficient number of his neighbors having means, their credit would be his credit under the limitations of the proposed agreement itself.    Mr. Wright was modest, as well as ambitious, and, therefore, when he learned that the attorney who managed the credit department of the aforesaid Grimes Dry Goods Company was attending court in Geneva, he forthwith visited the said attorney and submitted to him the writing relied upon as the basis of his credit scheme.    This attorney having slightly amended the draft presented to him, approved the plan proposed.    The approved writing, which Mr. Wright was thus encouraged to believe would meet a long-felt want, was in the following language:

" We, the undersigned, hereby covenant and agree with J. H. Wright to vouch for him in the purchase of goods to run a general store to the amount of $100 each. The period during which our names shall be used shall not be longer than one year from date of commencing said business, unless we shall at the 'close of such year, after making a careful examination of the condition of the store, see fit to continue our support. In consideration of allowing him to use our names in the purchase of goods, as above mentioned, J. H. Wright agrees to give each of us a discount of six per cent from the amount of goods we shall buy for our individual or family use, and we shall take out a coupon or pass book and shall be charged the regular retail price for goods, and in full settlement shall receive six per cent discount. It is further agreed that no claim, foreign or not pertaining to the proposed store, shall be paid out of any fund or stock of the store, for the reason that the said J. H. Wright owns and manages the store only by virtue of our vouching for him. Therefore, in case exigency of failure in part of J. H. Wright to be able to pay his bills, we, the below vouchers, then shall take into our hands the stock and employ a competent person to sell it to the best advantage possible and appropriate the proceeds to the payment of claims against the store and the expense of the sale. After which, if any amount remains, it shall be the property of said J. H. Wright. It is further a consideration of this agreement that the said J. H. Wright shall not buy to exceed one-third more than the total amount vouched for, and that the amount bought more than vouched for shall be at the risk of persons selling to him. The method of conducting the business shall be as nearly cash as possible. No note or account taken instead of cash shall be accepted without the approval of the bank, and no note or account shall run longer than sixty days without bearing ten per cent interest from commencement of the opening of such account. The banking busi-

ness shall be done with the Fillmore County Bank and the money taken in shall be deposited there at least once a week, and in payment of bills the said J. H. Wright shall check out of bank. It is also agreed that J. H. Wright shall offer to any grange or alliance, or other organization organized for financial benefits, a discount of four per cent on whatever goods its members may buy, except if they vouch equally with other vouchers they are to have the six per cent discount. It is hereby agreed that J. H. Wright shall have the privilege of using at least $35 per month as monthly wages for the family expenses and making payments on his house and lot, and shall not exceed $45 per month for his own family use. Also, the said J. H. Wright shall have the right to pay out from store the expenses of such store, such as freight, express, drayage, clerk hire, rent, etc.

"Subscribed and sworn to before me, a notary public, this —— day of ——, 1890."

This writing was never signed, and the evidence shows clearly that one or more plaintiffs in error never saw it or heard of its existence until after the collapse of Mr. Wright's enterprise. As none of the special findings of the jury have been attacked as wholly without the support of evidence, this lack of proof to conclude plaintiffs in error by the terms of this unsigned contract will receive no further notice and the said special findings will be assumed to be correct.

The evidence shows that about June 1, 1890, there were deposited in the Fillmore County Bank at Strang the accommodation notes of plaintiffs in error, payable to the order of J. H. Wright, as follows: That of George Whitman for $100; that of Eli Schultz for $100; that of W. A. Simms for $100, and that of Ira Wright for $200. There were other accommodation notes made to the order of J. H. Wright and deposited in the aforesaid bank, the aggregate amount of all the notes thus deposited, including

those of plaintiffs in error, being $1,950.    These were put
into the bank by J. H. Wright to his own credit, and upon
the faith of them he received accommodations at the bank
to the amount of $1,300.    This last named amount Mr.
Wright invested in goods with which he began business,
and no signer of any one of these notes ever asked or re-
ceived the benefit of the discount of six per cent, provided
for in the written draft of contract above set out, upon
such purchases as they made of Mr. Wright.    If we found
it necessary to review the special finding of the jury that
the plaintiffs in error assented to this proposed contract,
and under its provisions gave their accommodation notes,
their failure to avail themselves of this the only provision
to their advantage would of necessity be very important.
As would naturally be expected, Mr. Wright found that
the sum of $1,300 was insufficient to enable him to carry
on a profitable business.    He therefore bought merchandise
from wholesale houses on credit in several instances.    On
the 6th day of February, 1891, the plaintiffs in error claim
that they purchased from J. H. Wright his stock of goods.
They certainly went into immediate possession of the same
as owners and remained in such possession until dispossessed
by the sheriff.    The consideration of this sale was $2,400,
according to the testimony of plaintiffs.    The nineteen or
twenty accommodation notes given J. H. Wright, and
which were then in the Fillmore County Bank, were taken
up as part of the above consideration, the amount paid
therefor being $1,150.    One of the plaintiffs in error
frankly admitted that one inducement to the purchase was
to avoid payment of the full aggregate amounts of these
notes (about $1,950), which they would have been com-
pelled to pay if they had not secured possession of the
notes by paying the unpaid amount by the bank advanced
on the faith of them.    Of the balance of the $2,400 con-
sideration there was paid to H. P. Lau, a creditor of J. H.
Wright, the sum of $778; to Snyder & Loomis, also a

creditor, the sum of $256; and the balance was paid in cash to J. H. Wright himself. This stock was afterwards seized by the defendant in error, the sheriff of Fillmore county, to satisfy a writ of attachment for $603, including costs, in favor of Noyes, Norman & Co.; another writ of attachment in favor of Johnston-Fife Hat Company for $253, including costs; another writ of attachment in favor of Gilmore & Ruhl for $264, including costs; another writ of attachment in favor of J. T. Robinson Notion Co., for $305, including costs; in all, the above attachments were for the aggregate sum of $1,255 and $200 possible costs. Each of the above writs issued from the district court of Fillmore county. In his answer in this suit in replevin brought by plaintiffs in error for possession of above stock, the sheriff set up the above writs of attachment and his levy thereunder upon the above stock as that of J. H. Wright, against whose property in each instance the above writs had issued. He also justified his seizure of said stock as the property of J. H. Wright under a writ of attachment issued from a justice court in favor of Tychsen & Reusch for $46.05 and $50 probable costs, and another writ of attachment in favor of Katz, Nevens & Co. for $49.25 and $50 probable costs. The question presented in the replevin suit was whether or not the rights of possession of the plaintiffs in error, as purchasers, were superior to those of the creditors of J. H. Wright under their writs of attachment above described.

The jury being required to answer seven special interrogatories, made such answers as enable us to consider certain questions of law, for whether each finding was sustained by sufficient evidence or not certainly cannot be questioned by the defendant in error. The special interrogatories as answered were as follows:

"Question No. 1. When J. H. Wright went into business in June, 1890, did not the plaintiffs, together with other parties, at and near Strang, Nebraska, enter into an

agreement with said J. H. Wright to vouch for him to the wholesale houses?

"In answer to question No. 1, we, the jury, say 'yes.'

"Question No. 2. Does the memorandum agreement introduced in evidence as Exhibit 'D,' and identified by the witness Wright, constitute the agreement between Wright and his vouchers referred to in question No. 1?

"In answer to question No. 2, we, the jury, say 'yes.'

"Question No. 3. Did the plaintiffs deposit their personal notes on one year's time in the Fillmore County Bank to the order of J. H. Wright and for the purpose of giving Wright credit with the wholesale houses?

"In answer to question No. 3, we, the jury, say 'yes.'

"Question No. 4. Was it a part of the consideration of the sale of the goods from J. H. Wright to the plaintiffs that the notes referred to in question No. 3, together with the other notes deposited for a like purpose, should be delivered back to their makers by J. H. Wright?

"In answer to question No. 4, we, the jury, say 'yes.'

"Question No. 5. What was the fair and reasonable value of the stock of merchandise transferred by J. H. Wright to the plaintiffs at Strang, Nebraska, and at the time of such transfer?

"In answer to question No. 5, we, the jury, say '$3,650.'

"Question No. 6. Did the plaintiffs, at the time of the transfer to them of the property in controversy by Wright, know that by the terms of the purchase Wright was placing beyond the reach of his unsecured creditors all of his property that was liable to execution?

"In answer to question No. 6, we, the jury, say 'yes.'

"Question No. 7. Did J. H. Wright communicate to the plaintiffs his financial condition at the time of the transfer of the property in controversy by him to the said plaintiffs?

"In answer to question No. 7, we, the jury, say 'yes.'"

Following the above was a general verdict in favor of

the defendant in error, and the assessment by said general verdict of the value of the replevied property at $3,650, and of the value of defendant's possession at $1,983.21, upon which verdict judgment was duly rendered.

The above answers to the special interrogatories 1, 2, and 3 establish as facts that the draft of agreement prepared by J. H. Wright was assented to by the plaintiffs in error and governed the liability of plaintiffs in error to the parties who extended credit to J. H. Wright, among whom were included those creditors under whose writs of attachment the sheriff made his levies on the stock of goods in controversy and on whose behalf his defense was made in this action. The important question in this case arises upon the above three special interrogatories and the answers thereto, whereby the jury found that the accommodation notes on one year's time were deposited in the Fillmore County Bank for the purpose of giving Wright credit with the wholesale houses, and that the said deposits of notes by plaintiffs in error were made as required by the terms of the unsigned agreement hereinbefore referred to. Whether or not the unsigned memorandum of agreement (treated as signed) required the deposit of these notes for the benefit of the wholesale houses, was purely a question of construction of the terms of that instrument itself. In *Coquillard v. Hovey,* 23 Neb., on page 627, the rule applicable in such cases is laid down in the following language: "As we understand the rule for the construction of contracts, it is that, if a contract is to be construed by reference to its terms alone, and without calling in the aid of extrinsic facts and circumstances, it is the duty of the court to interpret it." The jury interpreted the writing as an agreement by the plaintiffs in error to vouch for J. H. Wright to the wholesale houses—what particular wholesale houses was left wholly in doubt. The undertaking was that the signers of the contract should vouch for J. H. Wright in the purchase of goods to run a general store to the amount of $100 each.

There is no room for doubt that each of the plaintiffs in error gave his accommodation note to J. H. Wright for a sum at least equal to $100, and that these notes were used by Wright in the purchase of his original stock. In the body of the unsigned contract was the following provision: "It is further a consideration of this agreement that the said J. H. Wright shall not buy to exceed one-third more than the total amount vouched for, and that the amount bought more than vouched for shall be at the risk of the persons selling to him." This is the only provision in the unsigned contract having special reference to wholesale houses. Such houses, if they relied upon the provisions of the unsigned contract, must have taken them *cum onere*. The terms of the contract upon which reliance is placed by these houses advised them that each of the plaintiffs in error was pledging his credit only to the extent of one hundred dollars, and whoever proposed an extension of credit to Mr. Wright was bound to ascertain whether or not each plaintiff in error had already responded to the full extent to which his credit was pledged to be given. This would probably follow without the language above quoted. From its restrictive limitation there was no escape. The trial judge, however, seems to have assumed that the plaintiffs in error owed some duty toward wholesale houses which had extended credit to J. H. Wright aside from the duty to furnish Wright with credit only to the extent of $100 each, for, at the request of the defendant, the jury was instructed as follows: "You are instructed that if you believe from the evidence that at the time J. H. Wright began business in June, 1890, plaintiffs and others entered into the agreement contained in the memorandum introduced in evidence as Exhibit 'D,' then plaintiffs could not make a valid purchase of the property in controversy from said Wright without assuming the liabilities of such wholesale houses as had furnished said Wright goods on the strength of said agreement," etc. This instruction was

Simms v. Summers.

clearly erroneous, for by the memorandum referred to no privity in any event was created as between the parties loaning a limited credit and the wholesale houses referred to. Not only so, but the limited credit required had been furnished by notes of plaintiffs in error deposited in the Fillmore County Bank before any credits whatever had been extended by either wholesale house to J. H. Wright. It was as though each plaintiff in error had agreed to sign with J. H. Wright a note for $100, and had already done so when these goods were bought by Wright from the wholesale houses. As to such goods, it would not seriously be contended that the sureties on notes already given would be liable further because they had agreed to sign notes for $100 each, and had already done so. Neither would it be seriously contended that because the sureties had signed said notes they were under obligations if they purchased the stock of goods of Wright to pay his debts other than those evidenced by the notes already signed. The instruction of the court given at the request of the defendant, however, laid down the rule that because the plaintiffs in error had agreed to vouch for Wright to the extent of $100 each, that thereby they were precluded from dealing with Wright with reference to his goods in the same manner as though they had never so vouched for him. It may have been true that the transfer was fraudulent as against the creditors of J. H. Wright. That question was to be determined by the jury upon proper instructions applicable to the evidence under consideration. At most, the court should have gone no further than to instruct that the relations existing between Wright and plaintiffs, as shown by the evidence, were proper to be taken into consideration in determining whether or not the transfer complained of was fraudulent as against creditors of J. H. Wright. The judgment of the district court is

REVERSED.

Post, J., not sitting.